UNITED STATES of America; The State of New York, and UDC–Love Canal, Inc., Plaintiffs,

v.

HOOKER CHEMICALS & PLASTICS CORPORATION; Hooker Chemicals Corporation; Occidental Petroleum Investment Company; The City of Niagara Falls, New York; Niagara County Health Department; and The Board of Education of the City of Niagara Falls, Defendants.

No. Civ–79–990C.

United States District Court, W.D. New York.

Feb. 23, 1988.
As Amended May 12, 1988.

U.S. Dept. of Justice, Environmental Enforcement Section, Land and Natural Resources Div., (Barry S. Sandals, Bruce S. Gelber, and Leonard H. Shen, of counsel), Washington, D.C., and Robert Abrams, Atty. Gen. of the State of N.Y. (Eugene Martin–Leff, Michael Bryce, Judith Kimmerling, and Edith Holleman, Asst. New York State Attys. Gen., of counsel), New York City, for plaintiffs.

Piper & Marbury (Thomas H. Truitt, and Steven K. Yablonski, of counsel), Washington, D.C., for defendants.

CURTIN, Chief Judge.

Plaintiffs United States of America [United States] and the State of New York [New York] now move for partial summary judgment against defendant Occidental Chemical Corporation [OCC][1] pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that this defendant is liable under section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act [CERCLA], 42 U.S.C. § 9607(a) for costs incurred by plaintiffs in their response to conditions at the Love Canal Chemical waste disposal site. The governments contend that the company is strictly liable as a responsible party pursuant to section 107(a)(2)–(4), and that the affirmative defenses asserted by OCC are insufficient to avoid this result in this case. Defendant OCC opposes.

**The Statutory Scheme**

Congress enacted CERCLA in December 1980 in response to the severe environmental and public health effects posed by the disposal of hazardous wastes.[2] CERCLA establishes three basic mechanisms to achieve its objectives. First, CERCLA provides the federal government with the necessary authority to respond to hazardous substance sources in an attempt to remove threats to the environment and to public health. Section 104, 42 U.S.C. § 9604. Second, CERCLA creates a fund [the so-called "Superfund"] to finance federal clean-up and response efforts. *See* section 517 of Pub.L. 99–499, 26 U.S.C. § 9507 (replacing CERCLA Section 221, 42 U.S.C. § 9631, repealed effective January 1, 1987). Third, CERCLA establishes a liability scheme to insure that those responsible for the release or threatened release of hazardous substances will be made to pay for the response costs and for damage to natural resources. CERCLA Section 107, 42 U.S.C. § 9607.

CERCLA Section 104, 42 U.S.C. § 9604, authorizes the Environmental Protection Agency [EPA] to take a response action whenever there is a release or threatened release of "hazardous substances" or any other "pollutants or contaminants" into the environment. The "response" actions which are permissible under CERCLA include a broad category of investigative, evaluative, and clean-up activities. Section 101(23)–(25), 42 U.S.C. § 9601(23)–(25).

In order to provide an administrative framework for responses to releases of hazardous substances, Congress mandated that actions be guided by the National Contingency Plan [NCP] which was originally promulated in 1973 to guide federal government clean-ups under the Clean Water Act, Section 311, 33 U.S.C. § 1321. Congress subsequently directed the EPA to revise the NCP to reflect and effectuate the responsibilities and powers created by CERCLA, Section 105, 42 U.S.C. § 9605. *See also* 40 C.F.R. § 300.61, *et seq.*

The liability scheme established by CERCLA Section 107(a) identifies four classes of potentially liable defendants: 1) current owners and operators of hazardous waste facilities; 2) past owners and operators of hazardous waste facilities; 3) persons, usually generators, who arrange for the disposal or treatment of hazardous waste; and 4) transporters of hazardous wastes. Section 107(a)(1)–(4), 42 U.S.C. § 9607(a)(1)–(4). This statutory section also describes the connection these defendants must have to a given waste disposal

---

1. *See* Item 175, p. 3 n. 2.

2. The CERCLA statutory scheme was amended by the Superfund Amendments and Reauthorization Act of 1986 [SARA], Pub.L. 99–499, 100 Stat. 1613 (October 17, 1986).

site in order to be held liable for the response costs resulting from the release or threatened release of hazardous substances from that site. Generally, the governments need not establish causation but need only show a given defendant meets the criteria of a "responsible party" under section 107(a) in order to be held liable under CERCLA. Liability under Section 107(a) is strict, joint, and several against each defendant, absent a showing that a defendant is entitled to one of the three narrow defenses contained in Section 107(b), 42 U.S.C. § 9607(b). The conveyance of property to a third party or "hold harmless" or other such agreements will not relieve a responsible party of liability. Section 107(e)(1), 42 U.S.C. § 9607(e)(1).

The history of the Love Canal is well known and may be summarized as follows. In the 1890s, William Love purchased and excavated the land in which the Love Canal is located as part of a proposed power canal bypassing Niagara Falls. This project was never completed, and the Love Canal was ultimately abandoned. In 1942, however, OCC arranged with the Niagara Power and Development Company for the use of this property for waste disposal purposes commencing that same year. In April of 1947, OCC purchased the Love Canal property and, in April of 1953, deeded the property to the Board of Education of the City of Niagara Falls, New York. The record establishes that, during the approximately 11 years OCC used the property for the disposal of chemicals, it deposited more than 21,000 tons—42 million pounds—of various wastes into the Love Canal. Included in these wastes were numerous hazardous substances, as defined in section 101(14) of CERCLA, 42 U.S.C. § 9601(14). Hazardous substances were subsequently detected in the surface water, groundwater, soil, the basements of homes, sewers, creeks, and other locations in the area surrounding the Love Canal landfill during the 1970s.

In the late 1970s, the United States commenced the funding of a remedial program for the Love Canal site. In 1982, the United States and New York entered into a cooperative agreement to provide additional remedial and investigatory work there. Based on the above facts, both the United States and New York now contend that they are entitled to partial summary judgment against OCC pursuant to section 107 of CERCLA, 42 U.S.C. § 9607. *See* Rule 56 of the Federal Rules of Civil Procedure. OCC opposes both of these motions.

Plaintiffs say that OCC is strictly liable under section 107 because it is a "person" who owned or operated a "facility" at which "hazardous substances" were "disposed" and from which there was a "release" or "threatened release" of a "hazardous substance" which caused plaintiffs to incur "response costs," including "removal [and] remediation action ... not inconsistent with the national contingency plan." *See, e.g., United States v. Northeastern Pharm. & Chem. Co. [NEPACCO]*, 579 F.Supp. 823, 850 (W.D.Mo.1984) (*citing* CERCLA section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A)), *modified in all respects*, 810 F.2d 726, 747–48 (8th Cir.1986).

Given the above statutory framework, plaintiffs argue that OCC is liable under CERCLA as an owner and/or operator at the time of the 1942–53 disposal. They claim that OCC meets the definition of "person" contained in CERCLA Section 101(21), 42 U.S.C. § 9601(21) and that the company owned or operated a "facility" within the meaning of CERCLA Section 101(9), 42 U.S.C. § 9601(9). The governments also contend that OCC was the owner and/or operator of the Love Canal facility sufficient to come within the ambit of CERCLA Section 101(20)(A), 42 U.S.C. § 9601(20)(A) and that hazardous substances were deposited at the facility during the time OCC owned and operated it. CERCLA Section 101(29), 42 U.S.C. § 9601(29), *citing* Section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903; CERCLA Section 101(14), 42 U.S.C. § 9601(14).

The United States further contends that there was a release or threatened release of hazardous substances from the Love Canal landfill. CERCLA Section 101(22), 42 U.S.C. § 9601(22). Finally, the United States argues that it is undisputed that it

has incurred removal and remedial costs in responding to the release of hazardous substances from the Love Canal. CERCLA Section 101(23–(25), 42 U.S.C. § 6901(23)–(25).

Plaintiffs also allege that OCC cannot avoid liability under section 107(a) by arguing that the statute cannot be applied against defendants for past acts of disposal. Instead, the governments say that both the legislative history and the case law, as well as the plain language of the statute, make clear that present conditions resulting from past acts come within the ambit of CERCLA Section 107(a)(2). *See, e.g., Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *United States v. NEPACCO, supra,* at 810 F.2d pp. 732–34. Plaintiffs also dispute that OCC can properly prevail on any challenge to CERCLA based on the Taking Clause of the Fifth Amendment or Article I's Contract Clause.

Plaintiffs say that they are entitled to recover its "response" costs under Section 101(25) of CERCLA, including those costs incurred prior to the passage of CERCLA and the implementation of all applicable provisions thereof. *United States v. Shell Oil,* 605 F.Supp. 1064, 1072–79 (D.Col. 1985); *United States v. NEPACCO, supra,* at 810 F.2d 734–37.

Finally, and most importantly, the governments say that OCC cannot avoid liability under section 107(a)(2)–(4) by claiming a third-party defense under Section 107(b)(3), 42 U.S.C. § 9607(b)(3). This statute says in pertinent part:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> \* \* \* \* \* \*
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

Plaintiffs say that OCC cannot come within the ambit of Section 107(b) because it had a direct and/or indirect contractual relationship with the third parties whom it alleges are responsible for the costs incurred by the government in this case. SARA §§ 101(f), 101(35)(A).[3] *See, e.g.,* Item 175, pp. 89–92. The governments also contend that, because of OCC's own actions at the Love Canal, it is now precluded from arguing that one or more third parties are "solely responsible" for any release or threatened release there.

In response, OCC says that summary judgment is inappropriate in this case because of the number of material factual issues in genuine dispute at this time. The company also alleges that the difficult and novel legal issues raised by this litigation make summary judgment even more inappropriate.

OCC also contends that the governments' legal arguments concerning the company's defenses in this action are without merit. It says that it would be incorrect to apply CERCLA Section 107 against OCC for costs incurred before December 11, 1980, the effective date of CERCLA, or for acts of disposal or releases occurring before that date. *See* Item 236, page 31 (*and cases cited therein*); *id.,* pp. 38–55. The company argues that the governments have not demonstrated that the statute is constitutional as applied to OCC in this case.

---

**3.** *See infra* n. 2.

Moreover, OCC claims that it should be permitted to pursue its act of God, act of war, and third-party defenses in this case based on the express terms of CERCLA Section 107(b), 42 U.S.C. § 9607(b). More specifically, OCC says that the "contractual relationship" exception to the Section 107(b)(3) third-party defense is inapplicable to the company's valid defense here because this exception was only intended to force a generator to retain liability where the third party whose acts or omissions caused the release was an agent of the generator or some other such related party. OCC says that this situation can be contrasted with the situation involved in this case, where OCC alleges that third parties caused the release acting independently at Love Canal.

Finally, OCC says that it cannot be held responsible for any costs except for those from Superfund or the Clean Water Act fund. *See* CERCLA, Sections 101(23), 101(24), 104(b), 107(a), 42 U.S.C. §§ 9601(23), 9601(24), 9604(b), 9607(a). *See* Item 236, pp. 85–100.

In their reply papers, plaintiffs argue that the recent case of *State of New York v. Shore Realty Corp.*, 759 F.2d 1032 (2nd Cir.1985), makes plain that summary judgment is not inappropriate in CERCLA cases. The governments reiterate their view that the company cannot avoid liability under Section 107(a) pursuant to the third-party defenses contained in Section 107(b). Contrary to OCC's position, plaintiffs claim that the third-party acts and omissions involve in this case all occurred in connection with contractual relationships between OCC and those third parties. They argue that OCC cannot relieve itself of liability for creating an environmental hazard on its property simply by conveying that property or by entering into contractual relationships with third parties which are not its agents. The United States reasons:

Congress did not have agency notions in mind in defining "contractual relationship" as OCC suggests. Instead, Congress focused its attention on a characteristic of the generator-disposer relationship that OCC itself concedes—presumably without appreciating the consequences—is paramount under the statute. Because the generator has a contract with the disposer, the generator is in a position to *control* the disposer's behavior with respect to the generator's waste. If disposal in a certain manner strikes the generator as improper, it can write into the contract a prohibition against the use of that method. ... Because of this contractual power, Congress concluded that no acts or omissions of the disposer can be so beyond the control of the generator as to relieve the generator of responsibility.

Item 265, pp. 56–57 (emphasis in original).

Even if this court were to find that OCC did not have a contractual relationship with the third parties which falls within the ambit of the exception to the Section 107(b) third-party defense, plaintiffs say that the company is not entitled to that defense because it cannot show that the harm at Love Canal was "solely caused" by one or more third parties. *Id.* at pp. 75–87.[4] The governments say that because OCC itself has alleged that the acts of various third parties related to it by contract caused or contributed to the problems at Love Canal, this court cannot find, as a matter of law, that this harm was "solely caused" by third parties within the meaning of CERCLA Section 107(b)(3).

In OCC's surreply in opposition to plaintiffs' motion, it argues that the governments have failed to meet their burden of demonstrating the absence of a genuine dispute regarding material facts in this case. Further, OCC says that plaintiffs are incorrect in stating that the company's

---

**4.** *Citing* 552 of the Restatement (Second) of Torts (1977) plaintiffs say that, where ultrahazardous activity is involved, OCC is strictly liable under the CERCLA statutory scheme, absent a showing by OCC that the acts of third parties in these cases were willful, malicious, or criminal.

Under a negligence standard of liability, an intervening act which is the foreseeable consequence of a situation created by a defendant is not a legally superseding cause of harm. Restatement (Second) of Torts, §§ 442B, 443 (1965).

defenses are based solely on "superseding causes." Instead, it claims that

> its own activities were not at all a contributing cause of subsequent problems at the Love Canal site ... [, that] its chemical byproducts were safely and lawfully enclosed at the Love Canal site and that rupture of the enclosure was due exclusively to the acts and omissions of third parties.

Item 295, page 25. In a supplemental memorandum, OCC states:

> the Love Canal property was well-suited for the disposal of wastes because of its location and hydrogeological characteristics, that OCC's disposal practices were proper, and that the wastes it deposited were left covered with clay in separate facilities in a safe and secure condition. OCC further maintains that but for various incursions directly into the facilities and alterations of the hydrogeological regime by parties other than OCC—occurring after OCC sold the site—exposure of chemicals and migration of leachate to adjacent yards, house basements and sewers would not have occurred.

Item 388, page 4. While OCC contends that further discovery is necessary to determine the precise nature of the claimed incursions and the effects of the alterations on the hydrogeological regime at Love Canal, it lists the following as actions by third parties which "compromised the physical and hydraulic barriers that had secured the Canal and created pathways for chemicals to migrate from the site." *Id.*, at page 5.

> [T]he Board of Education of the City of Niagara Falls [Board of Education] installed a subsurface [French] drain around the school it built immediately adjacent to the site. This drain became a direct pathway for migration. The City of Niagara Falls [the City] installed roads and sewers through the property which also became conduits for chemical migration. The State of New York, during construction of the LaSalle Expressway, relocated Frontier Avenue directly through buried wastes—again, breaking through the barrier walls which had secured the site and creating pathways for chemical migration.

These structures and activities, along with other actions by these and other entities, also significantly altered the hydrogeological regime at the Love Canal property. The removal of portions of the clay cover allowed infiltration of surface water into waste disposal areas. Previously-existing drainage pathways—outlets for surface water and periodic excess groundwater—were cut off by the City and the State, and eventually the Canal filled with water and overflowed. The roads and sewers, in addition to being direct pathways for chemical migration, also functioned as hydraulic "sinks" which drew the overflowing groundwater from the Canal property. These activities—not OCC's placement of the wastes in the Canal originally—caused chemicals in the Canal to migrate outward away from the Canal property toward residential areas.

*Id.* at pp. 5–6.

As was stated above, OCC alleges that the chemical landfill at Love Canal was "secure" at the time that the company conveyed the property to the Board of Education of the City of Niagara Falls in 1953 and that it contained both hydraulic barriers and physical barriers which prevented chemical migration. In support of its position, OCC has submitted the affidavit [Cutcliffe Affidavit] and supplemental affidavits of Mr. William E. Cutcliffe [Cutcliffe Supplement] (Items 391 and 399, respectively).

Mr. Cutcliffe's original affidavit states, during the time OCC deposited its chemical wastes into the Love Canal landfill, the area was considered well suited as a disposal site because the layers of soil in which the Canal was dug were very impermeable (Cutcliffe Affidavit, ¶ 3), and these soils formed the bottom and sides of the waste disposal facilities, and lay piled in berms on the banks of the excavated Canal, readily available for cover (Cutcliffe Affidavit, ¶ 4).

Mr. Cutcliffe also states that, in addition to the above, there were favorable drainage conditions in the area. He said that because of the depth of the Canal, low groundwater levels within the Canal cre-

ated a "sink" to which groundwater from the surrounding area tended to flow (Cutcliffe Affidavit, ¶ 4, attached Figure 2). Moreover, Mr. Cutcliffe said that the hydrogeological conditions at the site helped assure that leachate resulting from waste disposal at the Canal "would neither overflow the clay sides of the Canal nor migrate away from the Canal." Item 388, Supplemental Memorandum of Occidental Chemical Corporation, page 13. He said that overflow and migration of the periodic infiltration of groundwater through the relatively impermeable clay cover is avoided by way of several means: 1) to the north through a large "swale" which intersected the Canal and curved through its northern end (Cutcliffe Affidavit, ¶ 3); 2) to the south, through an 18-foot ditch which is located at the south of the railway rights-of-way at the south end of the Canal near the Niagara River (*id.*, ¶ 6); 3) two possible ditches or drains perpendicular to Frontier Avenue which ran parallel with the Canal alignment (Item 388, attached September 13, 1986, Affidavit of Steven K. Yablonski [Yablonski Affidavit], Exhs. 6–7); 4) to the south, a relatively permeable layer of silty sand which may have allowed drainage of surface water and periodic excess groundwater (Cutcliffe Affidavit, ¶ 6).

While Mr. Cutcliffe stated that groundwater movement from the soils adjacent to the Canal would have been toward the Canal, the "cover material would have limited infiltration" into the Love Canal "to 1 inch or less per square foot per year. . . .[,] less than ¼ gallon per minute over the entire area of both the northern and southern [portions of the Landfill"] (Cutcliffe Affidavit, ¶ 10). He opined that this situation was significantly changed by various subsequent acts by third parties, including 1) the closure of the swale's culvert beneath Colvin Boulevard, 2) the filling of the central section and the swale with chemical and municipal waste, 3) the removal or regrading of portions of the existing cover on the previously closed northern and southern portions of the Canal, and 4) the construction of the LaSalle Expressway, as well as *other direct incursions* (Cutcliffe Affidavit, ¶¶ 12–16). *See also* Item 388, pp. 18–39.

Following the governments' deposition of Mr. Cutcliffe on October 21, 1986 (Items 404 and 410), they filed a supplemental memorandum on October 24, 1986, in support of their CERCLA partial summary judgment motions (Item 411). They allege that Mr. Cutcliffe's statements actually substantiate their own arguments, not those of OCC.

More specifically, plaintiffs argue that Mr. Cutcliffe has conceded that the cause of the release of contaminated groundwater from the Love Canal was the rise in the groundwater levels within the portions of the Canal which had been filled by OCC with chemical wastes (Cutcliffe Affidavit, pp. 10–11). They say that he also represented that, at the time of dumping, the water levels in the filled sections of the Canal were approximately one and one-half to two feet below the top of the clay surface and the beginning of the more highly permeable soil layers (*id.*, pp. 6, 11; Deposition of Mr. William Cutcliffe [Cutcliffe Deposition], attached to Item 411, pp. 160–61). Mr. Cutcliffe admits that, even absent any incursions by third parties, the water level within the landfill would have risen approximately two inches per year, or something less than two feet in ten years (Cutcliffe Deposition, pp. 73–74, 152–61) due to seepage through the landfill covering and the lateral flow of water into the Canal (*id.*, pp. 49–52, 70–75, 81–85, 93–94). Accordingly, plaintiffs say that the evidence makes plain that chemical migration from the southern and northern portions of the landfill site would have commenced within ten years, even if no third parties had taken any actions at or near the landfill.

Given the above, the plaintiffs reiterate their view that OCC cannot afford itself of the Section 107(b)(3) third-party defense because it is clear that the acts of third parties were not the sole causes of the release or threatened release of hazardous substances at Love Canal. Item 411, pp. 7–10 (and cases cited therein).

Plaintiffs make several similar arguments with respect to the deposition testi-

mony of Mr. Frank A. Rovers, which was submitted to this court attached to OCC's Second Supplemental Memorandum [Second Supplement] on April 3, 1987 (Item 470). The company says that during his depositions during the earlier part of 1987, Mr. Rovers stated that 1) OCC's facility at Love Canal was a state-of-the-art facility at the time it was used as a waste disposal site by the company (Item 470, Rovers Deposition, p. 465); 2) OCC's disposal practices at the site were state-of-the-art (*id.*, pp. 496–97); 3) there was drainage out of the southern end of the Canal property which emptied into the Niagara River and prevented the Canal from filling up with water until the LaSalle Expressway built by the State of New York in 1968 closed off the pathway (*id.*, pp. 374–424); and 4) removal of the cover on the Canal and the blockage of the southern drainageways on the south during the LaSalle Expressway construction allowed water to infiltrate into the waste disposal areas, the Canal to fill up, and the "horizontal migration" onto adjacent residential properties to occur (*id.*, pp. 380–81, 402–03). Mr. Rovers also testified that the construction of roads, sewers, and other incursion in and around the Love Canal caused additional migration and exacerbated this so-called "bathtub effect" (*id.*, pp. 353–55, 359–60, 369, 394–401, 510–11).

Unlike Mr. Cutcliffe, Mr. Rovers testified that swale located at the northern end of the Love Canal did not historically provide outward flow from the Canal. *Id.*, pp. 363–68, 381–82, 414–15 and 418. Instead, he said that he believed that the swale only drained into the Canal and ultimately drained into the Niagara River by way of the southern drainageways (*id.*, pp. 366–420). According to Mr. Rovers, the total loading of organic chemicals from the Love Canal to the Niagara River would have been less than 0.2 pounds per day, or less than 63.1 pounds per year (*id.*, pp. 878–89).

Plaintiffs say that Mr. Rovers' statements at deposition flatly contradicts a number of positions taken in OCC's earlier papers, including the company's contentions that 1) the water in the Canal was completely contained when OCC left the Love Canal site in 1953, 2) the water in the

Canal was enclosed by numerous "dams" or, at least, that the northern and southern sectors of the site were hydrologically separate. Item 479, pp. 4–5. Indeed, plaintiffs characterize Mr. Rovers' explanation about how groundwater flowed southward through the Love Canal to the Niagara River as "pure speculation." *Id.* at page 5.

Notwithstanding the above, however, plaintiffs maintain that the Rovers deposition still provides no basis for a defense to CERCLA liability for a number of reasons. First, plaintiffs assert that the Section 107(b)(3) third-party defense is still unavailable to OCC because the City of Niagara Falls and the Board of Education of the City of Niagara Falls were contractually related to OCC and OCC continues to claim that their acts were partial causes of the release of hazardous substances at Love Canal. Secondly, the governments also claim that the third-party defense is also unavailable because OCC failed to exercise due care and failed to take the necessary precautions.

Third, plaintiffs claim that the third-party defense is also unavailable because it is clear that OCC contributed to the release of hazardous substances at the Love Canal by allowing contaminated water to flow out of the southern end of the Canal through or over intervening ground and into the Niagara River.

Because Section 107(b)(3) only allows a defense if one or more third parties are the sole cause of a release, OCC cannot avoid liability unless it can show that it was totally blameless in causing the release. Plaintiffs say that, by its own admission, OCC's acts contributed to the release of hazardous chemicals at Love Canal.

The governments say that, according to Mr. Rovers:

OCC is responsible for the flow of water out of the Canal which later allegedly backed up and was redirected from a southerly flow to an easterly and westerly migration. Without this pre-existing flow of water, the Expressway would, in Mr. Rovers' account, have had no effect.

Second, OCC covered the landfill with soil that permitted water to enter the

Canal from both the top and the sides. (Rovers Deposition, Tr. 2389–91) This was a source of the flow to the south and remained a source of the allegedly redirected radial (easterly and westerly) flow.

OCC created a landfill that allowed water to enter at a rate that could be accommodated only if some discharge point was available. Thus, Mr. Rovers testified that the water in the Canal "had to get out somewhere." (Rovers Deposition Tr. 1389–91) This is also clearly implied by Mr. Rovers' opinion that the alleged blockage of the southern egress point caused migration to begin elsewhere. This inexorable potentiality for the release of leachate somewhere was a contribution by OCC to the migration of the late 1970's. At most, all that any third parties did was to redirect the release or accelerate its flow.

In Mr. Rovers' scenario, the contamination of the 1970's was, thus, the product of the combination of OCC's and the State's actions—OCC's actions that permitted water to enter the landfill, mix with chemicals and flow out the southern end, plus the State's alleged rechanneling of that flow. OCC was a cause of the eventual migration.

Item 479, pages 16–17 (footnote omitted).

Plaintiffs also say that OCC's view that the contamination it admittedly caused in the Niagara River was *de minimus* is irrelevant for the purpose of establishing its CERCLA liability now. *E.g., United States v. Wade*, 577 F.Supp. 1326, 1340 (E.D.Pa.1983). They contend that there is no *de minimus* exception to CERCLA liability. *Cf., State of New York v. General Electric Co.*, 592 F.Supp. 291, 302–03 (N.D. N.Y.1984) (Section 107 liability does not depend on compliance with Section 104). The language of Section 107(a) makes clear that even a threatened release confers liability. Item 479, pp. 22–23.

In its reply memorandum (Item 490), OCC denies that the position of Mr. Rovers is not materially different from the position previously presented by the company. Moreover, OCC says that it did not "build,"

and, therefore, cannot be held responsible for the southern drainageway which transported groundwater and leachate from the Love Canal to the Niagara River. It states that Mr. Rovers makes clear that there was southern drainage before, during, and after the disposal operations, and that the company merely "left undisturbed" the southern drainage mechanisms that already existed. *Id.*, at page 10, 15 (*citing* Rovers Deposition, pp. 377–80).

OCC also contends that the governments' "sole cause" argument must fail because it is premised on a misunderstanding and mischaracterization of Mr. Rovers' testimony. It argues that Mr. Rovers stated that there was a relatively impermeable "tight cap" over the landfill at the end of OCC's disposal operations which prevented excess infiltration and any "bathtub effect" and horizontal migration from the site. OCC says that the southern drainageway was adequate to remove all infiltration. *See* Item 470, pp. 16–17 (citations omitted). Further, OCC says that the governments' view that the horizontal migration at Love Canal in the 1970s was not a mere "continuation" or "rechannelling" of southern migration is "illogical." *Id.* at page 18. Instead, it says that the horizontal migration was a new phenomena, solely caused by third parties. Finally, OCC says that it should not be held responsible for the small amount of discharge from the southern drainageway. *Id.* at pp. 19–21.

Finally, the governments have offered a response to OCC's Second Supplemental Reply Memorandum (Item 497), which again states that OCC's arguments are irrelevant for purposes of the instant motions. It says that the following facts are not in dispute:

*First*, OCC disposed of its chemical wastes at Love Canal from about 1942 to 1953. *See, e.g.*, OCC Admission No. 26 .... *Second*, following completion of OCC's disposal operations—but prior to any third-party actions—water began entering the waste disposal areas through the cover and the sides. (Rovers Tr. 379, 2389–91; Cutcliffe Tr. 73–75, 81). *Third*, also prior to any third-party activities, water that entered disposal areas mixed with chemicals and then, according to

OCC, migrated from the Canal through a southern drainageway to the Niagara River. (Rovers Tr. 379, 878, 1890). *Finally*, New York State's construction of the LaSalle Expressway in 1968, in OCC's view, blocked the southern drainageway, causing water levels in the Canal to rise and leachate to migrate horizontally toward the homes. (*Id.*, at 380–81, OCC Reply at 16).

Item 497, pp. 2–3 (emphasis in original). Plaintiffs say that these facts clearly establish a violation of CERCLA Section 107(a) by OCC. As such, plaintiffs argue that the company cannot successfully claim that the release or threatened release of hazardous chemicals from the Love Canal was "solely caused" by an unrelated third party. *E.g., United States v. Stringfellow*, No. CV83–2501 (C.D.Cal. Sept. 23, 1986) (Report and Recommendations of the Special Master), *adopted in all pertinent respects*, 661 F.Supp. 1053 (C.D.Cal. June 4, 1987). Put another way, plaintiffs argue:

> here, OCC contributed to the release by disposing of its chemical wastes in a manner that allowed water to enter the landfill, mix with chemicals to form leachate, and then discharge to the river. OCC's actions and omissions set in motion a chain of events that began with chemicals flowing southward from the canal to the river, which flow was, according to OCC, subsequently impeded and redirected laterally toward the homes by the acts of third parties.

Item 497, page 8. While plaintiffs concede that it may be argued that OCC should not be held responsible for the southward flow of *water* from the southern drainageway at Love Canal, the company cannot escape liability for the migration of *chemicals* by way of this route. *Id.*, page 11. Therefore, the governments urge that their respective motions for partial summary judgment be granted by this court.

■ For the reasons set forth below, this court now grants plaintiffs' motions for partial summary judgment. I find that OCC is strictly, jointly, and severally liable for CERCLA response costs incurred by the plaintiff governments in connection with the release and threatened release of hazardous chemicals from the Love Canal landfill, including those costs incurred prior to the passage and implementation of the CERCLA statutory scheme. *See* Section 107(a)(2), 42 U.S.C. § 9607(a)(2). However, a more specific determination regarding which costs incurred by plaintiffs are recoverable under CERCLA must await a later date.

As an initial matter, I find that it is beyond dispute that OCC is a potentially liable party as defined in CERCLA § 107, 42 U.S.C. 9607, as a result of the company's acknowledged disposal practices at the Love Canal site during the 1940s and 1950s. Section 107(a)(2)–(4), 42 U.S.C. § 9607(a)(2)–(4). Clearly, defendant OCC meets the statutory definition of a "person" who "own[ed] or operat[ed]" a "facility" at which "hazardous substance[s]" were disposed and from which there was a "release" or "threatened release" of "hazardous substance[s]" which caused plaintiffs to incur "response costs." CERCLA Sections 101, 107(a)(2), 42 U.S.C. §§ 9601, 9607(a)(2).

■ Moreover, I find without merit the company's arguments that its liability for present condition resulting from past acts are barred by the language of the statute or the United States Constitution. *Developments in the Law—Toxic Waste Litigation*, 99 Harv.L.Rev. 1439, 1540 n. 123, 1555–65 (1986) [1986 Harv.L.Rev.]. Instead, I believe that all of the leading authority makes plain that, while CERCLA contains no unequivocal statement that its liability provisions apply retroactively, CERCLA's legislative history suggests that the statute was enacted as a means of compelling the waste disposal industry to correct its past mistakes and to provide a solution for the dangers posed by inactive, abandoned waste sites. 1986 Harv.L.Rev., *supra* at 1539–43. All of the leading cases have also rejected defendants' challenges based on the Due Process or Taking Clauses of the Fifth Amendment or the Article I Contract Clause. I find these cases persuasive. *E.g., United States v. NEPACCO*, 810 F.2d at 733–34 (*citing Usery v. Turner Elkhorn Mining Co., supra; United States v. South Carolina Recy-*

*cling and Disposal, Inc.,* 20 E.R.C. 1753, 1761–62 (D.S.C.1984)). *See also* 1986 Harv. L.Rev. at pp. 1555–65.

■ Third, I find that the case law since the 1985 *Shell Oil* decision makes plain that, if liability is established, plaintiffs should be entitled to recover "response" costs from OCC for the period both before and after the enactment and implementation of the CERCLA statutory scheme. 605 F.Supp. at 1072–79. As Judge Carrigan said in that case, once it is accepted that a defendant may be liable for its pre-CERCLA acts, it is irrelevant from a constitutional perspective whether or not the government commenced clean-up before or after the Act became law on December 11, 1980.

■ I believe Judge Carrigan correctly noted that neither the verb tenses of the provisions of Section 107(a) nor the requirement of consistency with the NCP evince a clear congressional intent to impose or prevent liability for pre-enactment response costs. 605 F.Supp. at 1073–75. This conclusion is not altered by the language of CERCLA § 302(a), 42 U.S.C. § 9652(a), which states that "[u]nless otherwise provided, all provisions of [CERCLA] would be effective on the date of enactment of this Act [December 11, 1980]." As the *Shell* court found, I find that Section 302 is merely a standard "effective date" provision that indicates the date when an action can first be brought and when the time period begins to run for issuing regulations and doing other future acts mandated by the statute. It does not limit liability for response costs to those incurred after December 11, 1980.

Indeed, as the *Shell* court said, "the whole scheme of CERCLA was specifically designed to apply retroactively." 605 F.Supp. at 1075–76. The court arrived at this determination by reasoning that

> Congress implicitly authorized retroactive application of sections 107(a)(4)(A) and (B) [costs of removal or remedial actions by the United States, any state, or any other person] by affirmatively limiting retroactive application of the

third category of liability, damages to natural resources, section 107(a)(4)(C). 605 F.Supp. at 1076. The court concluded:

> Construing section 107(a) to preclude recovery of pre-enactment response costs would carve out an exception to the general retroactive scheme of the statute for those most severe situations where, as here, the government's response commenced prior to enactment of the statute. I cannot believe that Congress could have intended to protect the public fisc by imposing liability on the responsible parties, yet except the sites where response had already commenced because the situations were the most imminently threatening. Such an interpretation would penalize the government for prompt response and provide an undeserved windfall to the parties who had created, then abandoned, some of the most egregious sites. I decline to presume that Congress intended this irrational result.
>
> Thus, I conclude from the statute's explicit limitation on recovery of certain natural resources damages, and its failure to limit retroactive recover of response costs, that CERCLA authorizes recovery of response costs whether incurred before or after its enactment. I hold that Congress, in CERCLA, has overridden the presumption against retroactive application of statutes. The legislative history fully supports this conclusion.

*Id.* at 1076–77. *See also United States v. NEPACCO,* 810 F.2d 726, 734–37 (8th Cir. 1986); *United States v. Ottati & Gross, Inc.,* 630 F.Supp. 1361, 1398–99 (D.N.H. 1985); *Town of Boonton v. Drew Chemical Corp.,* 621 F.Supp. 663 (D.N.J.1985); *United States v. Ward,* 618 F.Supp. 884, 898–99 (E.D.N.C.1985).

Given the above, I find that defendant OCC must be held liable under CERCLA § 107(a) for the response costs incurred by the governments before and after CERCLA's enactment unless it can show that it may be entitled to one of the defenses contained in CERCLA § 107(b), 42 U.S.C. § 9607(b)(1)–(3). OCC argues that it is entitled to the Third–Party Defense contained in CERCLA Section 107(b)(3), 42 U.S.C. § 9607(b)(3). For the reasons stated below,

I believe that the company's arguments in this regard are without legal merit.

■ Contrary to the position taken by OCC In its papers, I find that the company cannot claim that it is entitled to assert the third-party defense if it has a direct or indirect contractual relationship with one or more of the third parties it claims are "solely responsible" for the release or threatened release of hazardous chemicals from a site. The SARA amendments make this plain. Section 101(f) of SARA adds new Section 101(35)(A), which states in pertinent part:

> The term "contractual relationship", for the purpose of section 9607(b)(3), of this title includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession
> . . . .

42 U.S.C. § 9601(35)(A). Although the pre-SARA language was not explicit on this point, I believe that Congress would not have included the so-called "innocent landowner" exceptions in the SARA amendments unless the statute did not otherwise preclude land purchasers from predicating a third-party defense on the acts of their predecessors in title. In addition, it is clear that Congress did not intend to extend the defense to the original disposers themselves, such as OCC in this case, even if such disposer-seller disclosed the release or threatened release to the purchaser. Item 425, Exh. 2.

Because OCC asserts that the acts of the Board of Education of the City of Niagara Falls and the City of Niagara Falls are among those acts "solely responsible" for the Love Canal chemical releases, it cannot now assert that it is entitled to assert a Section 107(b)(3) third-party defense. It is undisputed that OCC deeded the Love Canal property to the Board of Education of the City of Niagara Falls in 1953, and that the Board subsequently deeded part of this property to the City. OCC's direct or indirect contractual relationships with both the Board and the City preclude the company's assertion of a viable third-party defense in this case because, as the plaintiffs assert,

OCC was able to control the acts of these subsequent purchasers because of the nature of its relationship with these defendants in this case.

Moreover, even if OCC had no contractual relationship with the Board of Education of the City of Niagara Falls or the City of Niagara Falls, the company's assertion of a third-party defense would still fail. In my view, it is beyond dispute that OCC's disposal practices were at least partially responsible for the release or threatened release of the chemicals from the Love Canal Landfill during the subsequent years. The sworn statements of Messrs. William E. Cutcliffe and Frank A. Rovers support this finding.

While Mr. Cutcliffe states that the hydrogeological conditions at the Love Canal at the time OCC transferred the property were such that they would minimize chemical migration away from the landfill site,[5] He admits that infiltration entering the Love Canal through its clay cap would mix with its contents and exit through various passageways both to the north, through a large swale, and to the south, toward the Niagara River.

This view is essentially consistent with the deposition testimony of Mr. Rovers. Although Mr. Rovers says that he does not believe that leachate exited the landfill through the northern swale, he agrees with Mr. Cutcliffe that leachate did drain out of the southern end of the landfill property toward the Niagara River at the time OCC transferred ownership of the site to the Board of Education of the City of Niagara Falls.

■ It is clear that this release of chemicals from the southern end of the Love Canal property, undisputed by the parties, renders OCC liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a). While it is disputed at this time whether or not so-called "horizontal migration" toward nearby residential properties would have also occurred without the subsequent acts of various parties (including those with whom OCC had contractual relationships), it is also beyond cavil that OCC contributed to

---

**5.** Mr. Cutcliffe says that overflow would have occurred in about 10 years. *See supra* at pp. 553–54.

the horizontal migration of chemicals from the Love Canal site toward nearby residential properties by allowing a leachate flow to exit the southerly end of the Love Canal landfill. Were it not for this release and threatened release of chemicals, which the company alleges was blocked and rediverted by the State of New York's construction of the LaSalle Expressway, there would never have been horizontal migration of chemicals from the site and contamination of surrounding neighborhood. Therefore, I find, as a matter of law, that defendant OCC is precluded from asserting the Section 107(b) third-party defense with respect to the horizontal migration of chemicals from the Love Canal landfill. Again, defendant OCC must be held liable for this flow pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a).

While there have been various other arguments proposed by the parties regarding OCC's liability or lack thereof under CERCLA, this court declines to discuss these explicitly at this time. Suffice it to say, however, to the extent that these arguments are inconsistent with this court's decision today, I find these arguments unpersuasive.[6]

Plaintiffs' motions for partial summary judgment against defendant OCC are granted.

So ordered.

By letter dated March 24, 1988 (Item 625), Occidental Chemical Corporation [OCC] requests that the court amend certain language in its Supplement Order #20 (Item 610), which granted plaintiffs' motions for summary judgment under section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act [CERCLA], 42 U.S.C. § 9607(a). Plaintiff State of New York has filed a response in opposition to that request. Item 632. Plaintiff United States does not object "in principle" to OCC's request, but proposes its own revision of the court's language. Item 633.

It is apparent to the court that the proposed amendment, as modified by plaintiff United States' revision, would be entirely consistent with the meaning of Supplemental Order #20, as well as with the meaning and intent of CERCLA. Accordingly, that order is hereby amended as follows: [Editor's Note: The corrections herein were made in the opinion of Feb. 23, 1988.]

Supplemental Order #20 shall remain unchanged in all other respects.

So ordered.

---

**6.** These arguments include, *inter alia,* OCC's allegations that summary judgment is inappropriate here because the Love Canal was composed of multiple "facilities" and that the horizontal migration of chemicals occurred as a result of "multiple releases" from these facilities or from some other location(s) which cannot be determined at this time.