UNITED STATES of America; The State of New York, and UDC–Love Canal, Inc., Plaintiffs,

v.

HOOKER CHEMICALS & PLASTICS CORPORATION, et al., Defendants.

No. CIV–79–990C.

United States District Court, W.D. New York.

Aug. 25, 1989.

Robert Abrams, Atty. Gen., State of N.Y. (Eugene Martin–Leff, Louise A. Halper, and Lewis M. Milford, of counsel), New York City, for plaintiffs.

Piper & Marbury (Thomas H. Truitt, of counsel), Washington, D.C., for defendant Hooker Chemical & Plastics Corp.

## SUPPLEMENTAL ORDER No. 41

CURTIN, District Judge.

Pending for decision is plaintiff State of New York's motion, pursuant to Fed.R. Civ.P. 56, for partial summary judgment as to defendant Occidental Chemical Corporation [OCC]'s liability in this action under the New York common law of nuisance. Specifically, the State seeks this court's determination that OCC is liable as a matter of law for the creation of a public nuisance at the Love Canal landfill site, as well as for the costs incurred by the State in cleaning up the site. The State also seeks a determination that several of OCC's affirmative defenses are insufficient as a matter of law to defeat its nuisance liability. *See* Item 252, pp. 1–3.

For the purpose of deciding the instant motion, it is necessary to set forth the underlying facts in some detail. In May of 1894, William T. Love began construction of a canal to connect the upper and lower portions of the Niagara River as part of a comprehensive project to develop and utilize the area's water power potential. The construction was subsequently abandoned when industrial financiers of Love's company (the Niagara Power and Development Corporation [NPDC]) withdrew their backing due to several factors, such as the discovery of new ways to economically transmit electrical power, new legislation prohibiting the diversion of water from the upper Niagara River, and the depression of the 1890s. The unfinished canal, about three-quarters of a mile long, thirty feet deep, eighty feet wide at the top and forty feet wide at the base, was essentially intact when, in the early 1940s, OCC's corporate predecessor the Hooker Electrochemical Company [Hooker] sought to purchase the sixteen-acre canal site from NPDC. *See* Exhs. 1, 16, to Affidavit of Steven K. Yablonski, attached to Item 388.

In April, 1942, OCC and NPDC entered an agreement allowing OCC to use the Love Canal property for disposal of chemical wastes generated at its Niagara Falls plant while negotiations continued for purchasing the site. OCC actually purchased the property in 1947, and continued to dispose of chemical wastes there until it sold the property to the City of Niagara Falls Board of Education [the Board], for one dollar, in April, 1953. During its ownership and use of the property between April, 1942, and April, 1953, OCC deposited some 21,800 tons—more than 40 million pounds—of liquid and solid chemical waste in the Love Canal, including several substances designated as hazardous under the Clean Water Act, 33 U.S.C. §§ 1317(a) and 1321(b)(4), and the Comprehensive Environmental Response, Compensation and Liability Act [CERCLA], 42 U.S.C. § 9601(14).

Item 252, pp. 3–8; Item 309, pp. 2–3. For several years prior to 1953, the City of Niagara Falls [the City] also used the canal to dispose of "municipal wastes." Exh. 3, p. 4, attached to Item 252.

The deed conveying the Love Canal property to the Board contained the following provision:

> Prior to the delivery of this instrument of conveyance, the grantee herein has been advised by the grantor that the premises above described have been filled, in whole or in part, to the present grade level thereof with waste products resulting from the manufacturing of chemicals by the grantor at its plant in the City of Niagara Falls, New York, and the grantee assumes all risk and liability incident to the use thereof. It is, therefore, understood and agreed that, as a part of the consideration for this conveyance and as a condition thereof, no claim, suit, action or demand of any nature whatsoever shall ever be made by the grantee, its successors or assigns, against the grantor, its successors or assigns, for injury to a person or persons, including death resulting therefrom, or loss of or damage to property caused by, in connection with or by reason of the presence of said industrial wastes. It is further agreed as a condition hereof that each subsequent conveyance of the aforesaid lands shall be made subject to the foregoing provisions and conditions.

Exh. 4, attached to Item 311. During the next several years, a number of events took place on the property, including the construction of a school by the Board, the City's installation of sanitary sewer lines and removal of several thousand cubic yards of the soil used to cover the wastes deposited in the canal, and the State's relocation of streets and sewer lines onto the property in the late 1960s to allow for construction of the LaSalle Expressway. Item 309, pp. 6–9. In 1962, the Board conveyed the southern portion of the site to Mr. Ralph Capone (Exh. 44, attached to Item 311), who subsequently conveyed it to Mr. Lee C. Armstrong. *Id.*, Exh. 51. Several homes were built adjacent to the canal during this time. Item 252, p. 9.

During the 1970s, "[h]azardous substances were ... detected in the surface water, groundwater, soil, the basements of homes, sewers, creeks, and other locations in the area surrounding the Love Canal landfill...." *United States v. Hooker Chemicals and Plastics Corp.*, 680 F.Supp. 546, 549 (W.D.N.Y.1988). On June 20, 1978, New York State Commissioner of Health Robert H. Whalen, M.D., ordered the Niagara County Board of Health "to abate the public health nuisance now existing at the Love Canal Chemical Waste Landfill site" (Exh. 2, p. 3, attached to Item 252), and subsequently issued an order on August 2, 1978, declaring the site a public health emergency. *Id.*, Exh. 3, p. 11. Five days later, on August 7, 1978, President Jimmy Carter declared the site a federal emergency. *Id.*, Exh. 5. David Axelrod, M.D., Dr. Whalen's successor, continued the State emergency order in full force and effect by order dated February 8, 1979 (*id.*, Exh. 4), and President Carter issued a second federal emergency on May 21, 1980. *Id.*, Exh. 6.

This action was filed on December 20, 1979, to recover costs incurred by the federal and state governments to prevent further migration of wastes, to relocate families, and for other actions taken in response to these emergency orders. In addition to ruling on several discovery motions throughout the already long history of this case, the court, in its order dated February 23, 1988, found OCC jointly and severally liable for these response costs under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and granted the plaintiffs' motions for partial summary judgment in that regard. 680 F.Supp. at 556–59.

In support of its instant motion, the State contends that the record is sufficiently well-developed for the court to further enter partial summary judgment, this time as to OCC's liability for public nuisance. According to the State, in an action brought in the exercise of its police power to abate a public nuisance or to seek reimbursement for the cost of abating the nui-

sance, New York common law imposes joint and several liability on those responsible for the nuisance without the need to show negligence or fault. Item 252, pp. 12–27; 69–71. The State contends that this "strict" liability extends to OCC for its waste disposal activities at Love Canal both prior to and during its ownership of the property, and cannot be avoided by OCC's sale of the property to the Board notwithstanding the notice and disclaimer in the deed. Id., pp. 29–48. With regard to causation, the State argues that OCC, by disposing hazardous wastes in the canal, created the risk of harm to the public health which later was realized as actual harm when those wastes migrated, and thus OCC cannot be relieved of liability for that harm based on any intervening acts that may have caused the migration to occur when it did. Id., pp. 49–69. The State further contends that once OCC's liability for public nuisance is established, the State can recover all of the abatement costs which it incurred as a direct response to the public emergency at Love Canal. Id., pp. 71–80. Finally, the State contends that since OCC's liability can be established as a matter of law, its affirmative defenses should be dismissed insofar as they relate to plaintiffs' claims under the common law of public nuisance. Id., pp. 80–97.

In response to these arguments, OCC contends that several complex factual issues relating to the causation of the public emergency and the potential liability of other parties remain in dispute so as to preclude summary judgment at this juncture. Item 309. According to OCC, the disposal of chemical waste is not *per se* abnormally dangerous activity, and such a determination must be made by the trier of fact on a case-by-case basis. Id., pp. 14–20. OCC further argues that it cannot be held liable for contributing to the nuisance without a showing, under traditional tort law principles, that it was the proximate cause of the nuisance, which OCC contends is a disputed issue of fact inappropriate for summary resolution. Id., pp. 20–31. Also inappropriate for determination on the instant summary judgment motion, according to OCC, are the questions as to whether inde-pendent, unforeseeable acts of third parties constituted superseding causes relieving it of nuisance liability (id., pp. 31–38), and whether its liability for the nuisance terminated upon the sale of the property when the new owner was given notice and the opportunity to abate the unsafe condition. Id., pp. 38–50. OCC contends that this "sale defense" applies to both public and private nuisance actions (id., pp. 45–48), and to both the periods prior to and during OCC's ownership of the Love Canal property. Id., pp. 48–50. Finally, OCC contends that the State has not met its burden of demonstrating that OCC's affirmative defenses to nuisance liability are insufficient as a matter of law, particularly with respect to the assumption of risk defense. Id., pp. 50–53.

In its reply memorandum (Item 340), the State contends that none of OCC's arguments raises any factual issues to preclude summary judgment. According to the State, the standards of proximate cause and foreseeability urged by OCC do not apply to public nuisance actions brought by a sovereign in the exercise of its police power. Such actions, the State argues, require the application of a more expansive view of causation, one which imposes liability on the creator of a hazardous condition as the "cause" of the nuisance regardless of any intervening activity on the part of other parties, unexpected or otherwise. Item 340, pp. 11–17. Alternatively, the State contends that even under the causation and foreseeability standards urged by OCC, there is sufficient factual information in the record, such as the notice provision in the deed to the Board and other evidence indicating that OCC was aware during the time it was dumping the wastes of the possibility of resultant harm to persons or property, upon which the court may properly find OCC liable for public nuisance as a matter of law. Id., pp. 17–24.

OCC, in surreply (Item 351), distinguishes the legal standards applied to the "creation" of the condition giving rise to a public nuisance with those applied to the "maintenance" of the condition. According to OCC, the State may, in the exercise of

its police power, require the owner of the land on which the hazardous condition exists to abate the nuisance without the need to establish that the owner proximately caused the nuisance, but when liability is based on the creation of a condition which later becomes a nuisance, it must be established that the "creator" is the one who proximately caused the condition. Item 351, pp. 4–9. OCC also contends that the State's instant motion must fail since no evidence has been produced to establish a causal link between OCC's safe, state-of-the-art disposal of wastes and the alleged harm to the public. *Id.*, pp. 9–12. Finally, OCC reiterates its position that its affirmative defenses of sale of the property, superseding causes, and assumption of risk are sufficient as a matter of law to relieve it of nuisance liability, or at least raise enough factual issues to preclude the entry of summary judgment against it. *Id.*, pp. 12–21.[1]

These arguments illustrate the difficulty courts have sometimes had in discerning the applicable principles upon which to base their decisions regarding the "impenetrable jungle" of nuisance law. *Copart Industries, Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 170, 362 N.E.2d 968, 969 (1977) (quoting Prosser, Torts [4th ed.], p. 571).

Much of the uncertainty and confusion surrounding the use of the term nuisance, which in itself means no more than harm, injury, inconvenience, or annoyance (see Webster's Third New International Dictionary, p. 571; American Heritage Dictionary, p. 900), arises from a series of historical accidents covering the invasion of different kinds of interests and referring to various kinds of conduct on the part of defendants (Prosser, Torts [4th ed.], pp. 571–572).

*Copart*, 394 N.Y.S.2d at 171, 362 N.E.2d at 970. Thus, in order to alleviate some of the confusion, it is important to distinguish "private" and "public" nuisance, which "bear little relationship to each other. Although some rules apply to both, other rules apply to one but not the other." *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050 (2d Cir.1985).

There are, then, two and only two kinds of nuisance, which are quite unrelated except in the vague general way that each of them causes inconvenience to someone, and in the common name, which naturally has led the courts to apply to the two some of the same substantive rules of law. A private nuisance is narrowly restricted to the invasion of interests in the use and enjoyment of land. It is only a tort, and the remedy for it lies exclusively with the individual whose rights have been disturbed. A public nuisance is a species of catch-all low-grade criminal offense, consisting of an interference with the rights of the community at large, which may include anything from the blocking of a highway to a gaming-house or indecent exposure. Although as in the case of other crimes, the normal remedy is in the hands of the state, a public nuisance may also be a private one, when it interferes with private land. The seeds of confusion were sown when courts began to hold that a tort action would lie even for a purely

---

1. In discussing these arguments, it must be pointed out as an initial matter that this court's finding of OCC's liability under CERCLA, while precluding the recovery of "compensation for the same removal costs or damages or claims" under CERCLA and State law or other federal law, 42 U.S.C. § 9614(b), does not preempt the State "from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a). *See State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1041–42, 1050 (2d Cir. 1985). Further,

   [n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants. The provisions of this chapter shall not be considered, interpreted, or construed in any way as reflecting a determination, in part or whole, of policy regarding the inapplicability of strict liability, or strict liability doctrines, to activities relating to hazardous substances, pollutants, or contaminants or other such activities.

   42 U.S.C. § 9652(d); *see also Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 657–58 (N.D.Ill.), *aff'd,* 861 F.2d 155 (7th Cir.1988).

public nuisance if the plaintiff had suffered "particular damage."

Prosser, *Private Action for Public Nuisance*, 52 Va.L.Rev. 997, 999 (1966) (footnotes omitted) (quoted in *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 315 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985).

■ Under the common law as it has developed in New York,

[a] public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency. It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons.

*Copart*, 394 N.Y.S.2d at 172, 362 N.E.2d at 971 (citations omitted). An action for private nuisance may be maintained by a person with a legally protected interest in respect to the particular use and enjoyment of the land against one whose conduct is a legal cause of the invasion of such interest, and the invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities. *Id.; see also State of New York v. Schenectady Chemicals, Inc.*, 117 Misc.2d 960, 459 N.Y.S.2d 971, 976 (Sup.Ct. 1983) [*Schenectady I*], *aff'd as modified*, 103 A.D.2d 33, 479 N.Y.S.2d 1010 (3rd Dept.1984) [*Schenectady II*].

"[W]ith reference to a public nuisance, it is not necessary to show acts of negligence" (42 N.Y.Jur., Nuisances, § 16. p. 462), although such a showing is not prohibited. One who creates a nuisance through an inherently dangerous activity

or use of an unreasonably dangerous product is absolutely liable for resulting damages, irregardless of fault, and despite adhering to the highest standard of care (*Spano v. Perini Corp.*, 25 N.Y.2d 11, 302 N.Y.S.2d 527, 250 N.E.2d 31).

*Schenectady I*, 459 N.Y.S.2d at 976.

The court in *Schenectady I* denied defendant's motion to dismiss an action brought by the State of New York under the common law of public nuisance to compel the defendant chemical company to pay for the costs of cleaning up a chemical dump site owned by an independent contractor at which defendant had disposed hazardous wastes some 15 to 30 years earlier. In sustaining the cause of action, the court held that, "[w]hile ordinarily nuisance is an action pursued against the owner of land for some wrongful activity conducted thereon, 'everyone who creates a nuisance or participates in the creation or maintenance ... of a nuisance are liable jointly and severally for the wrong and injury done thereby.'" *Id.* (quoting 17 Carmody-Wait 2d, N.Y.Prac., § 107:59, p. 334). The court based this holding, at least in part, on the premise that, "with respect to public nuisances and inherently dangerous activities, fault is not an issue, the ultimate inquiry being limited to whether the condition created, not the conduct creating it, is causing damage to the public." *Id.* at 979 (footnote omitted).[2]

Relying on the *Schenectady Chemical* cases, the Second Circuit in *Shore Realty* extended public nuisance liability "irrespective of negligence or fault", 759 F.2d at 1051, to a party responsible not for creating but for maintaining the nuisance. As one of the few cases to discuss the "interplay" between CERCLA and the common law of public nuisance, 759 F.2d at 1037, *Shore Realty* provides persuasive precedent in several respects. The Circuit Court affirmed the district court's grant of par-

**2.** The omitted footnote states:

Whether the dumping of chemical wastes constitutes an ultra-hazardous activity is a question for the jury, unless the record is such that the determination can be made as a matter of law (cf. *Cohen v. Thomas Co.*, 51 A.D.2d 963, 380 N.Y.S.2d 294; and *A.J.P. Contr. Corp.*

*v. Brooklyn Bldrs. Supply Co.*, 171 Misc. 157, 11 N.Y.S.2d 662, affd. 283 N.Y. 692, 28 N.E.2d 412). In either event, such a determination should be made upon the close of proof after the benefit of expert testimony.

*Schenectady I*, 459 N.Y.S.2d at 979 n. 1.

tial summary judgment in favor of the State in its suit against the Shore Realty Corp. and Donald LeoGrande, Shore's officer and stockholder, brought under CERCLA and State statutory and common law of nuisance to compel the cleanup of a hazardous waste disposal site which Shore had acquired for land development purposes. The court allowed the entry of summary judgment on the public nuisance claim, holding Shore "liable for maintenance of a *public* nuisance irrespective of negligence or fault." *Id.* at 1051 (emphasis in original) (citing *McFarlane v. City of Niagara Falls,* 247 N.Y. 340, 343, 160 N.E. 391 (1928)). The court also found no "requirement that the State prove actual, as opposed to threatened, harm from the nuisance in order to obtain abatement." *Id.*

We also reject Shore's argument that its maintenance of the ... site does not constitute a public nuisance. We have no doubt that the release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus is a public nuisance as a matter of New York law

. . . .

And while we recognize that determining whether an activity is abnormally dangerous depends on the circumstances, a review of the undisputed facts under the guidelines stated in *Doundoulakis v. Town of Hempstead,* 42 N.Y.2d 440, 448, 368 N.E.2d 24, 27, 398 N.Y.S.2d 401, 404 (1977), convinces us that a New York court would find as a matter of law that Shore's maintenance of the site—for example, allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste—constitutes abnormally dangerous activity and thus constitutes a public nuisance.

*Shore Realty,* 759 F.2d at 1051–52 (citing *Schenectady II,* 479 N.Y.S.2d at 1013; *State of New York v. Monarch Chemicals, Inc.,* 90 A.D.2d 907, 456 N.Y.S.2d 867, 868–69 (3rd Dept.1982); *New Jersey State Department of Environmental Protection v. Ventron Corp.,* 94 N.J. 473, 492, 468 A.2d 150, 160 (1983) (holding that "simply dumping [a hazardous substance] onto land or into water" is an abnormally dangerous activity)).

The *Doundoulakis* case involved the question whether "hydraulic dredging and landfilling, that is, the introduction by pressure of a continuous flood of massive quantities of sand and water, is, under the circumstances, an abnormally dangerous activity giving rise to strict liability." 398 N.Y.S.2d at 402, 368 N.E.2d at 25. In its decision, the New York Court of Appeals adopted the guidelines provided by the Restatement of Torts Second § 520 for determining whether an activity is abnormally dangerous:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* at 404, 368 N.E.2d at 27 (quoting Restatement (Second) of Torts § 520).

OCC argues that an analysis of the facts and circumstances of the instant case in light of these guidelines must wait until further discovery, and thus summary judgment is inappropriate at this juncture. However, as demonstrated by the *Shore Realty* case, a complete review of the undisputed facts surrounding the maintenance of a disposal site in order to determine whether the activity at the site is abnormally dangerous is not necessary where there has been a "release or threat of release of hazardous wastes into the environment," 759 F.2d at 1051, and there is nothing in the present summary judgment record to convince the court that the same should not hold true when the liability of the creator of the underlying condition—*i.e.,* the generator and disposer of the hazardous wastes—is at issue. While the New York courts have not explicitly held that the disposal of hazardous wastes by the generator is, in itself, an abnormally dangerous activity requiring the application

of strict liability standards, the language employed by the leading cases certainly indicate that such a holding would not be unreasonable in a case such as the instant one, in which it is undisputed that such wastes have been released into the environment so as to "endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart,* 394 N.Y.S.2d at 172, 362 N.E.2d at 971. The *Schenectady I* court found that, while defendant's disposal of chemical wastes several years earlier did not constitute a "discharge" for the purposes of establishing a cause of action for statutory fines under the State Environmental Conservation Law, such disposal did give rise to a cause of action for public nuisance, since "[o]ne who creates a nuisance through an inherently dangerous activity or use of an unreasonably dangerous product is absolutely liable for resulting damages, irregardless of fault, and despite adhering to the highest standard of care." 459 N.Y.S.2d at 976. In its affirmance, the court in *Schenectady II* stated that it "[did] not hesitate in recognizing that the seepage of chemical wastes into a public water supply constitutes a public nuisance", 479 N.Y.S.2d at 1013 (citing *Copart, Monarch Chemicals,* and *Amax, Inc. v. Sohio Prods. Co.,* 121 Misc.2d 814, 469 N.Y.S.2d 282 (1983) (sustaining nuisance cause of action on theory of strict liability for abnormally dangerous activity)), and that it "may reasonably be deemed the case [that the activity is inherently dangerous] where the disposal of hazardous wastes are involved...." 479 N.Y. S.2d at 1014. Further, the Second Circuit in *Shore Realty* had little difficulty in granting the State's motion for summary judgment against the current owner and maintainer of a site at which several other parties had disposed hazardous wastes, since it "[had] no doubt that the release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus is a public nuisance as a matter of New York law." 759 F.2d at 1051.

The instant case presents an even more compelling set of facts and circumstances for finding the existence of a public nuisance than did *Shore Realty.* The declarations and orders of State Health Commissioner Whalen issued in June and August of 1978, and continued in full force and effect by his successor, Dr. Axelrod, in February of 1980, found that the conditions existing at the Love Canal landfill site constituted a "public health nuisance" subject to abatement by the proper authorities. *See* Exh. 2, p. 3, and Exh. 3, p. 12, attached to Item 252. The area was further declared a federal emergency by President Carter in orders dated August, 1978, and May, 1980. *See* Exhs. 5, 6, attached to *id.* Moreover, several undisputed facts have been established which, when viewed in light of the common law standards for public nuisance as set forth by the New York courts and adopted by the Second Circuit, and discussed *supra,* support a finding of OCC's liability for creation of the "public health nuisance" which culminated in the emergency declarations. It is undisputed that, during the period of its use and ownership of the Love Canal property, OCC deposited over 21,800 tons of liquid and solid chemical waste in the Canal (Item 222, Responses and Objections of Occidental Defendants to Plaintiff United States First Request for Admissions, #25), several of which have been identified as hazardous substances under CERCLA (Item 108, Answers and Objections of Hooker Chemicals and Plastics Corp. to New York State Plaintiffs' First Interrogatories and Requests for Documents, ¶15(a); Item 248, Supplemental Admissions, #26). It is also undisputed that water which infiltrated the Love Canal mixed with the wastes to form leachate (Item 222, #222), which eventually migrated offsite to contaminate the groundwater, soil, and other areas surrounding the Canal (Item 248, ## 221, 226, 383–84, 386).

■ OCC has pleaded several affirmative defenses to public nuisance liability.[3]

---

**3.** There are 23 affirmative defenses in the answer with reference to the State' public nuisance claim: First (failure to state cause of action,

Item 150, ¶35); Second (statute of limitations, ¶36); Third (failure to join necessary parties, ¶37); Fourth (pre-emption by federal statute,

*See* Item 150. Specifically, OCC argues that, even if the common law of public nuisance can be interpreted to impose the strict liability standard urged by the State, it still must be shown that OCC's conduct was a proximate cause of the injury, a showing that OCC contends cannot be made on the instant motion for summary judgment. However, New York public nuisance law is clear that, in an action brought by the State in the exercise of its police powers for either abatement or restitution, "fault is not an issue, the inquiry being limited to whether the condition created, not the conduct creating it, is causing damage to the public." *Schenectady I,* 459 N.Y.S.2d at 979. Moreover, the law of the case, as established in this court's CERCLA liability decision of February 23, 1988, is that

> OCC contributed to the horizontal migration of chemicals from the Love Canal site toward nearby residential properties by allowing a leachate flow to exit the southerly end of the Love Canal landfill. Were it not for this release and threatened release of chemicals, which [OCC] alleges was blocked and rediverted by the State of New York's construction of the LaSalle Expressway, there never would have been horizontal migration of chemicals from the site and contamination of surrounding neighborhood[s].

680 F.Supp. at 558–59. Thus, the court found no genuine issue as to OCC's responsibility, at least in part, for the "release and threatened release" of hazardous wastes into the environment, and granted plaintiffs' motions for partial summary judgment under CERCLA. That finding is equally applicable to the pending motion, and sufficiently establishes the lack of any genuine issue of material fact as to whether OCC was a proximate cause of the condi-

tions that resulted in the emergency and "public health nuisance" declarations.

OCC also contends that even if a causal connection between its conduct and the public nuisance can be established as a matter of law, that connection was broken by independent acts of other parties which constituted superseding causes relieving OCC of nuisance liability. However, the above analysis regarding proximate cause applies as well to this "superseding cause" defense, and makes it clear that the disposal of hazardous wastes in the Love Canal by OCC "remains the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did." *Commonwealth v. Barnes & Tucker,* 23 Pa.Commw.Ct. 496, 353 A.2d 471 (1976), *aff'd,* 472 Pa. 115, 371 A.2d 461, *appeal dismissed for want of substantial federal question,* 434 U.S. 807, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977).

■ OCC also contends that any liability it may have incurred for creation of the public nuisance was terminated when it sold the property to the Board of Education with notice in the deed of the presence of wastes on the property. According to OCC, New York courts have long followed the rule for continuing liability for nuisance after the transfer of land as stated in the Restatement (Second) of Torts, which provides:

> (1) A vendor or lessor of land upon which there is a condition involving a nuisance for which he would be subject to liability if he continued in possession remains subject to liability for the continuance of the nuisance after he transfers the land.
>
> (2) If the vendor or lessor has created the condition or has actively concealed it from the vendee or lessee the liability stated in Subsection (1) continues until

¶ 38); Eighth (causation, ¶ 42); Ninth (due care, ¶ 43); Tenth (failure to satisfy conditions precedent, ¶ 44); Eleventh (no health danger, ¶ 45); Fifteenth (conditions precedent, ¶ 49); Seventeenth (sale defense, ¶ 51); Eighteenth ("state of the art"/due care, ¶ 52); Nineteenth (proximate/superseding cause, ¶ 53); Twentieth (assumption of risk/contributory negligence, ¶ 54); Twenty–First (assumption of risk, ¶ 55); Twen-

ty–Second (superseding cause, ¶ 56); Twenty–Third (laches, ¶ 57); Twenty–Fourth (estoppel, ¶ 58); Twenty–Fifth (failure to mitigate damages, ¶ 59); Twenty–Sixth (lack of standing, ¶ 60); Twenty–Seventh (abstention, ¶ 61); Twenty–Eighth (failure to provide notice, ¶ 62); Twenty–Ninth (no right to restitution, ¶ 63); and Thirtieth (adequate remedy at law, ¶ 64).

the vendee or lessee discovers the condition and has reasonable opportunity to abate it. Otherwise the liability continues only until the vendee or lessee has had the reasonable opportunity to discover the condition and abate it.

Restatement (Second) of Torts § 840A; *see Pharm v. Lituchy*, 283 N.Y. 130, 132, 27 N.E.2d 811 (1940) (liability of owner for nuisance persists beyond conveyance at least until new owner has had reasonable opportunity to inspect and discover the condition and make necessary repairs).

The State refers to *State of New York v. Ole Olsen, Ltd.*, 65 Misc.2d 366, 317 N.Y. S.2d 538 (Sup.Ct.1971), *aff'd*, 38 A.D.2d 967, 331 N.Y.S.2d 761 (2nd Dept.1972), *after trial*, 352 N.Y.S.2d 97 (S.Ct.1973), *aff'd mem.*, 45 A.D.2d 821, 357 N.Y.S.2d 1016 (1974), *aff'd as modified*, 35 N.Y.2d 979, 365 N.Y.S.2d 528, 324 N.E.2d 886 (1975), as support for its contention that, in an action such as the instant one brought by the State for restitution of costs incurred as a result of an exercise of police power to abate a public nuisance, New York courts have rejected the "sale defense" urged here by OCC. I agree. My reading of the cases that have touched on the issue presented (none have addressed it directly) indicates that the different interests protected by the doctrines of public and private nuisance, as well as the nature of the activity involved, require the application of an exception to the limitation of a vendor's liability found in the Restatement. In *Ole Olsen*, a public nuisance abatement action brought by the State, the trial court denied the motion to dismiss made by the original defendants, developers/builders of homes with faulty sewage disposal systems which, once the homes were sold and occupied, caused contamination of a nearby pond, based on the defendants' contention that they could not be held liable for abatement of the nuisance since they had sold the properties prior to the discovery of the harmful condition. The court held that "[a]mple authority exists to the effect that the creater [sic] of a nuisance does not, by conveying his property to another, release himself from liability for its continuance." 317 N.Y.S.2d at 541 (citations omitted). In

its affirmance of the denial of defendants' motion, the Second Department found defendants' contentions that "their sale of these properties, with the nuisance thereon, has absolved them from any liability for the creation of the nuisance ... untenable." 331 N.Y.S.2d at 763. The fact that these opinions failed to refer to the limitation of vendor liability in Restatement § 840A(2) is, I believe, of no consequence, since the New York courts had every opportunity, at every available level of review, to consider the Restatement's implications on its common law of public nuisance, yet chose not to do so.

The case of *Merrick v. Murphy*, 83 Misc.2d 39, 371 N.Y.S.2d 97 (Sup.Ct.1975), decided shortly after *Ole Olsen*, while based primarily on theories of negligence and private nuisance, is also instructive. There the court denied defendant's summary judgment motion made on the grounds that he could not be held liable for a dangerous condition allegedly created by him on land which he had sold six years prior to the occurrence of the accident giving rise to the complaint. The court noted a distinction

> between mere negligent maintenance of property and affirmative acts of negligence in the actual creation of a nuisance or dangerous condition. In the latter instance, ownership or possession of the property upon which the condition is found, is not necessarily a prerequisite to responsibility for injury or damage which results therefrom.

> \*   \*   \*   \*   \*   \*

> The claim here is based solely on allegations of affirmative acts of negligence in the creation of a dangerous condition on the ... property. Under this theory, ownership is immaterial and the fact that defendant transferred his interest in the property prior to the dates in question does not render the complaint insufficient as a matter of law.

*Id.* 371 N.Y.S.2d at 100.

The only federal appellate decision to touch on the issue is not to the contrary. The Third Circuit, in *Philadelphia Electric*

*Co. v. Hercules, Inc.,* 762 F.2d 303 (3d Cir), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985), applied the same essential common law principles regarding public nuisance as the New York courts would apply to the instant case in holding that a seller's ability to shift to a buyer its liability for private nuisance claims by selling the property did not affect the State's right to bring an action against the seller for creating a public nuisance. *Id.* at 315. In so holding, the court emphasized that its decision "should not be interpreted as standing for the general proposition that a party that contaminates land, or the successors to its assets, can escape liability by the expedient of selling the land." *Id.* at 318.

There is also supporting precedent from New Jersey. In *New Jersey State Department of Environmental Protection v. Exxon,* 151 N.J.Super. 464, 376 A.2d 1339 (Ch.Div.1977), the court relied on *Ole Olsen* in finding a former landowner liable for nuisance resulting from dumping oil onto neighboring property, based on the "general rule that the creator of a nuisance remains liable even after alienating his property." 376 A.2d at 1349. More recently, the New Jersey Supreme Court found three former owners of a mercury processing plant jointly and severally liable for costs to abate the dangerous condition caused by discharges of mercury despite the fact that a fourth, non-polluting owner currently occupied the property. *New Jersey State Department of Environmental Protection v. Ventron Corp.,* 94 N.J. 473, 468 A.2d 150 (1983).

Based on these considerations, I find OCC's "sale defense" without merit, and therefore find no genuine issue of material fact with regard to whether OCC's liability for nuisance terminated upon its sale of the Love Canal area, with notice to, and disclaimer of liability as against, subsequent purchasers.

▮ OCC also contends that it is entitled to the affirmative defense of assumption of risk, since the State expressly assumed the risks of any injury resulting from the wastes deposited at the Love Canal when it acquired the southern portion of the property, upon which it built the LaSalle Expressway, with actual notice of the presence of the wastes as contained in the exculpatory covenant of the deed. It must be noted here that the State acquired the property, amounting to less than 2% of the 16-acre site, in fee from then-owner Ralph Capone through the exercise of its eminent domain power, pursuant to Section 30(3) of the New York State Highway Law then in effect. *See* Item 341, Affidavit of Eugene Martin-Leff, and Exhibits attached thereto.

The defense of assumption of risk is predicated upon a plaintiff's

agreement, express or implied, not to hold defendant responsible for the injury-causing act, negligent though it may have been, which resulted from plaintiff's entering into the activity with knowledge of its danger, or under circumstances from which it could be found that he or she should have had such knowledge of it.

*Arbegast v. Board of Education,* 65 N.Y.2d 161, 490 N.Y.S.2d 751, 754–55, 480 N.E.2d 365, 368 (1985). In 1975, the New York State legislature enacted Article 14–A of the Civil Practice Law and Rules [C.P.L.R.], which provides that as to all causes of action for personal injury, injury to property, or wrongful death accruing on or after September 1, 1975,

the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.

N.Y.C.P.L.R. § 1411. "Culpable conduct claimed in diminution of the damages, in accordance with [§ 1411], shall be an affirmative defense to be pleaded and proved by the party asserting the defense." N.Y. C.P.L.R. § 1412. Further, "[i]n an action for nuisance the plaintiff's assumption of risk is a defense to the same extent as in other tort actions," Restatement (Second) of Torts § 840C, and the defense applies to

public nuisance actions as well as to those for private nuisance. *Id.,* Comment (d).

The *Arbegast* case held that C.P.L.R. § 1411 does not foreclose a complete defense to liability where the injured party has expressly consented that no duty exists, "except as public policy proscribes an agreement limiting liability." 490 N.Y.S.2d at 757, 480 N.E.2d at 371. While the exculpatory covenant contained in the deed provision, at least arguably, serves as express consent to invoke the assumption of risk defense in this case, I believe that the public policy exception should apply for several reasons. Under the theory of eminent domain prevalent in New York State, "the condemnor takes title to land free of all encumbrances and inconsistent proprietary rights and extinguishes all interests and estates in the property." *Ossining Urban Renewal Agcy. v. Lord,* 39 N.Y.2d 628, 385 N.Y.S.2d 28, 29, 350 N.E.2d 405, 406 (1976). Further, in the absence of illegality, fraud, collusion, corruption or bad faith, "[t]he New York courts show due deference to the state when it exercises sovereign powers". *Kohl Industrial Park Co. v. County of Rockland,* 710 F.2d 895, 901 (2d Cir.1983). Moreover, and perhaps most importantly, OCC's assertion of assumption of risk as a defense to its liability for restitution[4] should not as a matter of public policy be allowed to completely bar recovery by the State for the costs it incurred, on lands properly acquired, in exercising its police power to protect the public health. *Cf. Carillo v. Axelrod,* 88 A.D.2d 681, 450 N.Y.S.2d 909, 910 (3rd Dept.1982) (doctrine of estoppel does not apply to the State acting in a governmental capacity, especially in the area of public health).

Accordingly, OCC's assumption of risk defense shall apply to this case, but in accordance with C.P.L.R. § 1411 "shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the [State] bears to the culpable conduct which caused the damages."

The court has considered OCC's other affirmative defenses to public nuisance liability (*see infra* note 3) and finds them either inapplicable or without merit.

I therefore find that there is no genuine issue of material fact remaining in the case as to OCC's joint and several liability under the common law of public nuisance, and hereby enter summary judgment in favor of plaintiffs on their public nuisance claim as a matter of law. This holding does not otherwise affect OCC's crossclaims and counterclaims for public nuisance liability, which will be taken up at a later date.

So ordered.

---

**4.** OCC concedes that the assumption of risk defense is not a complete defense to liability for restitution of all abatement costs, but argues that the State should at least be completely barred for recovering for the damage caused by the wastes on the portion of the property that it did acquire.