UNITED STATES of America; State of New York; and UDC–Love Canal, Inc., Plaintiff,

v.

OCCIDENTAL CHEMICAL CORPORATION; Oxy Chemical Corporation; Occidental Chemical Holding Corporation; Occidental Petroleum Investment Company; Occidental Petroleum Corporation; the City of Niagara Falls, New York; the Niagara County Health Department and the Board of Education of the City of Niagara Falls, Defendants.

No. 79–CV–990C.

United States District Court, W.D. New York.

May 30, 1997.

As Amended July 21, 1997.

Piper & Marbury, Washington, DC (Thomas H. Truitt, Steven K. Yablonski, Anthony L. Young, of Counsel), for Defendant Occidental Chemical Corporation.

Earl W. Brydges, Jr., Richard E. Stanton, Niagara Falls, NY, for Defendant City of Niagara Falls.

## DECISION AND ORDER

CURTIN, District Judge.

## BACKGROUND

### A. Prior Proceedings

In 1979, plaintiffs State of New York and the United States brought suit against defendant Hooker Chemicals & Plastics Corporation ("Hooker"). In 1982, Hooker became Occidental Chemical Corporation ("OCC"). Throughout the decisions relevant to this case, "Hooker" is used to describe the company during the events in question and "OCC" is used to refer to the current defendant. *United States v. Hooker Chemicals & Plastics Corp.*, 850 F.Supp. 993 (W.D.N.Y. 1994). The suit was initiated to recover the costs of cleaning up and insuring the safety of the Love Canal area pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a) and the New York common law of public nuisance. *Id.*

The case was bifurcated into two phases: Phase I to determine the liability of all parties and the principles of contribution or indemnification, and Phase II, if necessary, to determine the nature and amount of remedies in any unsettled claims. Prior to trial on the Phase I issues, the court granted summary judgment against the defendant for joint and several liability under both CERCLA § 107 and the common-law public nuisance claim. *United States v. Hooker Chemicals & Plastics Corp.*, 680 F.Supp. 546 (W.D.N.Y.1988) (Supplemental Order No. 20); *United States v. Hooker Chemicals and Plastics Corp.*, 722 F.Supp. 960 (W.D.N.Y. 1989) (Supplemental Order No. 41).

The trial on the Phase I issues against defendant and the trial on the various third-party claims and counterclaims began on October 24, 1990, and continued until June 25, 1991. In this court's decision of March 17, 1994, *United States v. Hooker Chemicals & Plastics Corp.*, 850 F.Supp. 993 (W.D.N.Y. 1994), the court dismissed the claim of New York State against the OCC for punitive damages and reserved decision on the remaining issues. Following that decision, New York and OCC settled the nuisance claim of the State against OCC on July 1, 1994 (Item 1352). Modifications followed (Item 1370). Eventually, final judgment was entered against the State as to all claims between the State and OCC (Item 1355). That left the issue of third-party claims and the claim of the United States against OCC. On March 18, 1996, a partial consent decree

was entered between the United States and OCC, with OCC agreeing to pay for federal remediation efforts at the site, and the federal government agreed to drop its suit against OCC. Item 1361.

The only claims remaining in the case are the claims and crossclaims between the City of Niagara Falls and Occidental. In this order, the court will address liability only. Amount and apportionment of damages will await a Phase II trial, if necessary.

## B. Facts

OCC purchased the Love Canal property in 1947, using it for the disposal of some 40 million pounds of chemical wastes until it sold the property to the City of Niagara Falls Board of Education for one dollar in 1953. The deed conveying the Love Canal property to the Board contained the following provision:

Prior to the delivery of this instrument of conveyance, the grantee herein has been advised by the grantor that the premises above described have been filled, in whole or in part, to the present grade level thereof with waste products resulting from the manufacturing of chemicals by the grantor at its plant in the City of Niagara Falls, New York, and the grantee assumes all risk and liability incident to the use thereof. It is, therefore, understood and agreed that, as a part of the consideration for this conveyance and as a condition thereof, no claim, suit, action or demand of any nature whatsoever shall ever be made by the grantee, its successors or assigns, against the grantor, its successors or assigns, for injury to a person or persons, including death resulting therefrom, or loss of or damage to property caused by, in connection with or by reason of the presence of said industrial wastes. It is further agreed as a condition hereof that each subsequent conveyance of the aforesaid lands shall be made subject to the foregoing provisions and conditions.

Item 311, Ex. 4; *United States v. Hooker Chemicals and Plastics Corp.*, 722 F.Supp. 960, 962 (W.D.N.Y.1989) (Supplemental Order No. 41).

The deed was reviewed for the Board by City of Niagara Falls Deputy Corporation Counsel Ralph A. Boniello. In a letter dated May 5, 1953, Boniello warned the Board that it was accepting "the risk and possible liability to persons and/or property injured or damaged as a result thereof arising out of the presence and existence of the waste products and chemicals upon the said lands. ...." Ex. 162. As a condition of the transfer, Hooker continued to dump waste on the property, and Boniello also warned the Board about possible liability arising from that continued dumping. *Id,; United States v. Hooker Chemicals & Plastics Corp.*, 850 F.Supp. 993, 1027 (W.D.N.Y.1994).

Hooker did not provide specific data about the chemicals in the landfill. This court concluded that given the technology available at the time, such an analysis would have been unreasonably costly and difficult. Nevertheless, the court concluded that Hooker did know with some precision the composition and dangers of certain chemicals buried in the Canal, and that it could have made a more diligent effort to communicate its knowledge to the Board. *Id.* at 1028–1030.

At some point in 1958, the Board offered a portion of the property to the City in order to develop recreational facilities. At first, the City refused to take the land "because of the tremendous holes being created due to the chemical reaction in the land." Ex. 531.

However, when the Board offered the land again in May 1959, the Council recommended that the City Manager look into the possibility of a transfer. Ex. 531A. A number of City officials, along with a representative of Hooker, inspected the property to determine whether it was suitable as a recreation area. Ex. 3626, No.37.

In 1960, the Board conveyed title to the northern section of the property to the City. The northern section of the property is the portion extending south from the northern boundary along Colvin Boulevard to Reed Avenue. Appendix A–1, Ex. 1433; *Hooker Chemicals & Plastics Corp.*, 850 F.Supp. 993, 1005 (W.D.N.Y.1994). The conveyance was expressly made "subject to the terms [and] conditions" of the Hooker deed to the Board. Ex. 3626, No. 41.

Prior to the conveyance, the City operated a landfill on the site from approximately Spring 1953 until late 1954. Tr. 5210 (Cull). The City stipulated that it filled open portions of the Love Canal property with, among other things, ash from the municipal incinerator, cinders collected from homes, and dirt. Ex. 3626, No. 24. OCC offered testimony at trial intended to show that the City also buried hazardous wastes on the site. OCC Proposed Findings of Fact, pp. 9–13.

Also prior to the conveyance, the City constructed Wheatfield Avenue and the Wheatfield Avenue sanitary sewer across and through the Love Canal landfill. Ex. 3626, Nos. 31, 32. The City excavated the landfill to construct the street and sewer, and backfilled the sewer lines with excavated soil. *Id.*, No. 33. There was testimony at trial that the City encountered hazardous wastes during the excavation, and that the sewer system transmitted chemicals away from the site. OCC Proposed Findings of Fact, p. 16.

In about 1959, the City constructed Read Avenue between 97th and 99th Streets and installed a storm drain as part of the project. Ex. 3626, No. 35. Read Avenue was constructed across the Love Canal disposal area, and the City excavated the property in the process. *Id.*, No. 36. Evidence was offered at trial that the City uncovered drums during the construction, and that the storm drain conducted chemicals offsite. OCC Proposed Findings of Fact, pp. 16–17.

In 1962, the Board conveyed the southern portion of the site to Mr. Ralph Capone. Item 311, Ex. 44. The State of New York thereafter acquired a portion of Capone's property through the exercise of its eminent domain power to build the LaSalle Expressway. *Id.* at 41.

By the mid–1970s, complaints about surface exposure to chemical wastes had increased significantly. These complaints were eventually accompanied by reports from neighboring residents of chemicals seeping into their homes. Their reports led a series of governmental agencies to investigate the site, establish an interagency task force, and decide on a course of remedial action. *Hooker Chemicals & Plastics Corp.*, 850 F.Supp. at 1039.

The City prepared and presented a preliminary program for addressing the conditions at Love Canal on January 13, 1977. The City participated in the formation of the Love Canal Study Group, which ultimately included Hooker and other local governments. The City also contracted with a number of companies to investigate leachate movement, vacuum surface liquid, and develop a remediation plan. City's Proposed Findings of Fact, ¶¶ 12–15.

On June 20,1978, New York State Commissioner of Health Robert H. Whalen, M.D. ordered the Niagara County Board of Health "to abate the public health nuisance now existing at the Love Canal landfill...." Item 252, Ex. 2, p. 3, and subsequently issued an order on August 2, 1978 declaring the site a public health emergency. *Id.*, Ex. 3, p. 11. As a result of information gathered by a study group and Whalen's staff, further investigation was ordered. A remedial plan and this lawsuit followed.

In Supplemental Order No. 41, this court found OCC jointly and severally liable under the common law of public nuisance. The court also held that:

> While the exculpatory covenant contained in the deed provision, at least arguably, serves as express consent to invoke the assumption of risk defense in this case, I believe that the public policy exception should apply for several reasons.... [P]erhaps most importantly, OCC's assertion of assumption of risk as a defense to its liability for restitution should not as a matter of public policy be allowed to completely bar recovery by the State for the costs it incurred, on lands properly acquired, in exercising its police power to protect the public health.

*United States v. Hooker Chemicals and Plastics Corp.* 722 F.Supp. 960, 971 (W.D.N.Y.1989) (footnote omitted).

The court concluded by noting that the order did not affect OCC's crossclaims and counterclaims for public nuisance liability. *Id.*

OCC now cross-claims against the City of Niagara Falls, seeking contribution from the

City for its "equitable proportionate share" of costs under both CERCLA and the common law of public nuisance. OCC also asserts as a defense to the City's counterclaim that the covenant not to sue executed between Hooker and the Board renders the City solely liable for the costs of remediation of the public nuisance. The City counterclaims, and also raises a number of defenses to liability, including (1) that the damages were caused solely by a third party; (2) the City is not liable because it acquired the property involuntarily; (3) the City neither created nor maintained the nuisance; (4) the City has equitable defenses to liability; and (5) OCC has not asserted a claim which would render the City jointly and severally liable.

## DISCUSSION

### I. Occidental is jointly and severally liable in public nuisance.

█ Private parties may contractually allocate among themselves any loss they may suffer by the imposition of CERCLA liability, but cannot limit their liability to the federal government. *Keywell Corp. v. Weinstein*, 33 F.3d 159 (2d Cir.1994). Courts will enforce such a contract where the provisions show the clear and unmistakable intent of the parties. *Id.* Such contract provisions are consistent with the broad goals of CERCLA: namely, to establish a federal cause of action in strict liability, enabling the Environmental Protection Agency to pursue rapid recovery of costs incurred in responding to hazardous waste problems. *Purolator Products Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124 (W.D.N.Y.1991) (Larimer, J.).

Although this court has previously held that covenants not to sue executed prior to the enactment of CERCLA cannot be said to have contemplated CERCLA liability, *Westwood Pharmaceuticals. Inc. v. National Fuel Gas Distribution Corp.*, 737 F.Supp. 1272 (W.D.N.Y.1990), this is not a rule which has been uniformly employed in this circuit. For example, in Purolator, Judge Larimer concluded that indemnity agreements executed in 1975 and 1979, both prior to the enactment of CERCLA, were broad enough to encompass CERCLA liability although environmental liability was not specifically mentioned. *Purolator*, 772 F.Supp. at 131.

For the purposes of the present cross-motions, the court assumes that the covenant at issue here would be sufficiently specific to cover CERCLA liability under the *Purolator* approach. Moreover, the fact that the land was purchased for one dollar indicates that the Board of Education and OCC bargained for the assumption of liability by the Board. In addition, the provision in the deed between the Board and the City, quoted above, incorporated the original covenant not to sue, and amounted to an endorsement and adoption of the covenant by the City.

█ The City argues that even if there is a valid covenant not to sue, it cannot be bound by it because it engaged in the clean-up not as a landowner, but rather under its "police power" to abate a public nuisance. At oral argument, counsel for the City stated that the abatement procedures were begun at the direction of the County Board of Health, which ordered the City to respond to the public health emergency identified by the State. Tr. Vol. LXXVIII, pp. 139–40.

The City's argument finds support in this court's Supplemental Order No. 41. In that order, the court held that the covenant not to sue did not sustain the assumption of risk defense then asserted by OCC. This court concluded that it would harm the public good to completely bar recovery by the City "for the costs it incurred, on lands properly acquired, in exercising its police power to protect the public health." Supplemental Order No. 41, 722 F.Supp. at 971.

There are important similarities between the present situation and the facts before the court in Supplemental Order No. 41. First, both the State and City took title to their respective parcels under the same terms and conditions set out in the original deed between Hooker and the Board. The assumption of risk defense asserted by OCC at that time is therefore nearly identical to its reliance on the covenant not to sue currently before the court; OCC argues now, as it did then, that the language of the original deed bars the action. Although this court assumes that the covenant would be valid

against another private corporation, the court is mindful that in this action, as in OCC's assumption of risk defense against the State, public policy concerns must be carefully considered. Now, as then, it would harm the public good to completely bar recovery by the City "for the costs it incurred, on lands properly acquired, in exercising its police power to protect the public health."

Against the public interest, the court weighs the important fact that Hooker sold the parcel to the Board for one dollar based on Hooker's understanding that it would not be sued for any environmental liability. Were the City a private entity, the covenant might well be valid, and this court does not disturb that bargain lightly.

However, the greater good is served by voiding the covenant. If the City were a private entity, or had considered engaging in remedial efforts simply as a landowner, it would have been able to litigate the extent of its liability before paying for any remediation, while the EPA funded immediate work on the site. As a public entity, the City was obliged to act immediately, without regard for the extent of its liability, in order to address a public health threat. If this court were to enforce the covenant, the City would be stripped of its rights to contribution from other parties after acting. Such a situation would do a significant disservice to the citizens of Niagara Falls. The court therefore declares the covenant not to sue void for the purposes of this order.

## II. The City is a liable party under CERCLA.

### A. The City did not acquire the property involuntarily.

■ OCC argues that the City is jointly and severally liable as the current owner of the property under CERCLA § 107(a)(1) and as the party that owned the property at the time hazardous substances were disposed of under CERCLA § 107(a)(2). The City argues that is exempted from those provisions by CERCLA § 101(20)(D) which exempts local governments that acquire property by necessity and do not contribute to the release of hazardous wastes.

Section 107 provides that the owner of a facility or "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" is liable under CERCLA. 42 U.S.C. § 9607(a)(1) & (2).

Section 101(20)(D) provides:

The term "owner or operator" does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

42 U.S.C. § 9601(20)(D).

The City argues that in purchasing the property to build roads and a park, it was making an involuntary purchase because these are functions that a sovereign must perform. The City offers no authority for this construction.

The City's definition of involuntary is inconsistent with Congressional intent in enacting CERCLA. First, the statute clearly states that as a general matter State and local governments are not to be distinguished from private entities. Since all municipal purchases are made for the benefit of citizens, the City's construction of the word involuntary would cause the exception to swallow the rule. Second, the statute sets out the types of involuntary acquisitions contemplated by Congress; bankruptcy, tax delinquency, and abandonment. A purchase to build a park simply does not follow as an analogous circumstance "in which the government involuntarily acquires title by virtue of its function as a sovereign." Finally, the

circumstances of the acquisition do not satisfy the plain meaning of the word involuntary. The City evaluated the land carefully and considered the problems of the buried waste before taking title from the Board. This is clear evidence that the City purchased the land voluntarily.

The court notes that a closer question might be presented if the City had acquired the property through eminent domain, in order to build a necessary structure or road that could not be placed elsewhere. But even where a state government acquired land by eminent domain in order to build a freeway, at least one court held that the purchase was made voluntarily and that section 106(20)(D) did not apply. *See Transportation Leasing Co. v. State of California (Cal-Trans)*, 861 F.Supp. 931 (C.D.Cal.1993).

## B. CERCLA's third party defense does not relieve the City from liability.

The City argues that CERCLA § 107(b)(3) shields it from liability because the hazardous substances at issue were released solely by Occidental. Section 107(b)(3) provides:

(b) There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

.    .    .    .    .

3) an act or omission of a third party other than ... one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substances, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and

the consequences that could foreseeably result from such acts or omissions....
42 U.S.C. § 9607(b)(3).

In Supplemental Order No. 20, this court held that "OCC's direct or indirect contractual relationships with both the Board and the City preclude the company's assertion of a viable third-party defense...." *United States v. Hooker Chemicals & Plastics* Corp., 680 F.Supp. 546, 558 (W.D.N.Y.1988). The court held that a party "cannot claim that it is entitled to assert the third-party defense if it has a direct or indirect contractual relationship with ... the third-part[y] it claims [is] 'solely responsible' for the release or threatened release of hazardous chemicals from a site." *Id.*

■ This court concluded that an indirect contractual relationship arose when Hooker "deeded the Love Canal property to the Board ... in 1953, and that the Board subsequently deeded part of this property to the City." *Id.* There is no reason to depart from the holding in Supplemental Order No. 20. Having barred OCC from invoking a CERCLA third-party defense due to the contractual relationship with the Board and the City, it would be inconsistent and unfair to now allow a party to the same contract to invoke the defense.

## III. The City is jointly and severally liable in public nuisance.

In Supplemental Order No. 41, this court held that the Love Canal site was a public nuisance under New York law. The court found that OCC was jointly and severally liable to the plaintiffs, but that "this holding does not otherwise affect OCC's crossclaims and counterclaims for public nuisance liability...." 722 F.Supp. at 971.

CERCLA section 9607(b) sets out the statutory defenses to negligence under section 9607(a). The available defenses include that the release was caused solely by a third party whose actions were not foreseeable by the defendant, who was exercising due care with respect to the hazardous substance. 42 U.S.C. § 9607(b).

In *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050, (2d Cir.1985), the

Court of Appeals held that under New York law a landowner "is subject to liability for either a public or private nuisance on its property upon learning of the nuisance and having a reasonable opportunity to abate it." *Id.* The court went on to find it "immaterial therefore that other parties placed the chemicals on this site, [the owner] purchased it with knowledge of its condition ... and with an opportunity to clean up the site.... Moreover, [a landowner] is liable for maintenance of a *public* nuisance irrespective of negligence or fault." *Id.* at 1051.

In Supplemental Order No. 41, this court noted that the *Shore Realty* court relied on the decision of the New York State Supreme Court in *State of New York v. Schenectady Chemicals, Inc.,* 117 Misc.2d 960, 459 N.Y.S.2d 971, 976 (Sup.Ct.1983)[*Schenectady I*], *aff'd as modified,* 103 A.D.2d 33, 479 N.Y.S.2d 1010 (3d Dep't 1984)[*Schenectady II*]. The *Schenectady I* court held that "[w]hile ordinarily nuisance is an action pursued against the owner of land for some wrongful activity conducted thereon, 'everyone who creates a nuisance or participates in the creation or maintenance ... of a nuisance are liable jointly and severally for the wrong and injury done thereby.' " *Id.* (citation omitted). The court based this holding in part on the premise that "with respect to public nuisances and inherently dangerous activities, fault is not an issue, the inquiry being limited to whether the condition created, not the conduct creating it, is causing damage to the public." *Id.* at 979 (footnote omitted).

This court then concluded that *"Shore Realty* extended public nuisance liability 'irrespective of negligence or fault', to a party responsible not for creating, but for maintaining the nuisance." Supp. Order No. 41, 722 F.Supp. at 965.

The City now claims that it cannot be held liable in public nuisance because it did not know of the nuisance and when it did learn of problems it addressed them reasonably. City Memo at 22. OCC counters that the "portions of *Shore Realty* relied upon by the City, in arguing that current owner liability in public nuisance turns on knowledge of the nuisance, opportunity to abate and failure to

do so, are derived from private nuisance cases and apply only when the vendor seeks to shift *all* liability to the vendee, thereby absolving itself of liability." Occidental Reply Brief at 27.

■ Neither party's reading of *Shore Realty* is entirely persuasive based on this court's reading of the plain language of the decision. The Court of Appeals stated simply that the landowner must have knowledge of the problem and an opportunity to abate before liability attaches. Upon finding knowledge and opportunity to abate, liability attaches, and the argument that the landowner responded reasonably is not a defense because a landowner "is liable for maintenance of a *public* nuisance irrespective of negligence or fault." *Shore Realty* at 1051.

■ The City clearly knew of the conditions giving rise to the public nuisance. The covenant not to sue executed as part of the deed between Hooker and the Board of Education, set out that the property had been "filled, in whole or in part, to the present grade level thereof with waste products resulting from the manufacture of chemicals by the grantor." The covenant clearly contemplated that the nature of the waste was not benign, and might in the future cause significant injury. For that reason the covenant specifically covered "injury to a person or persons, including death resulting therefrom, or loss of or damage to property caused by, in connection with or by reason of the presence of said industrial wastes."

From the terms of the covenant, and testimony at trial, the court concludes that the City knew or should have known that the waste was present. The City does not claim it did not have an opportunity to abate, but only that it addressed the problems reasonably as they arose over the years. As noted, reasonable abatement efforts are not a defense to public nuisance liability. These efforts are appropriately addressed at the apportionment phase of trial.

Consequently, the City is jointly and severally liable for the public nuisance. The court notes that the City's arguments about divisibility of harm are premature, and will be addressed at Phase II of trial if necessary.

**IV. The City's equitable defenses are barred.**

■ "CERCLA is a strict liability statute, with only a limited number of statutorily-defined defenses available. The available defenses are that the release was caused solely by an 'act of God [or] war,' or that the release was caused solely by a third party whose actions were not foreseeable by the defendant, who was exercising due care with respect to the hazardous substance." *General Electric Co. v. Litton Industrial Automation Systems, Inc.*, 920 F.2d 1415, 1418 (8th Cir.1990) (citing 42 U.S.C. § 9607(b) (other citations omitted), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991)). "CERCLA does not provide for an 'unclean hands' defense; the liability imposed by 42 U.S.C. § 9607(a) is subject only to the defenses noted above [in 42 U.S.C. § 9607(b) ]." *Id.*

This language precludes the City's assertion of both the unclean hands and equitable estoppel defenses because neither of these are set out in the statute. OCC points out correctly that these equitable concerns are appropriately considered in the apportionment phase, but do not affect the parties' liability. Similarly, the City's arguments that the harm is divisible, and that it is not liable because OCC has not paid more than its proportionate share, is a question to be determined in the apportionment phase.

## CONCLUSION

For the foregoing reasons, both OCC and the City have liability for the remediation costs at the site.

So ordered.